**LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) and Dr. Harold Jones, Plaintiffs,**

v.

**NORTH EAST INDEPENDENT SCHOOL DISTRICT, Molly Pruitt, Muriel McDonald, Dr. Ann Dixon, William E. McCabe, Dr. G. Richard Holt, Richard Ojeda, and Bruce Bennett, All in Their Official Capacities as Members of The Board of Trustees of The North East Independent School District, San Antonio, Texas, Defendants.**

Civ. No. SA–93–CA–483.

United States District Court,
W.D. Texas,
San Antonio Division.

Sept. 25, 1995.

Judith A. Sanders–Castro, San Antonio, TX, Rolando L. Rios, San Antonio, TX, Mark Stanton Smith, Law Offices of John R. Heard, San Antonio, Jose D. Garza, Law Offices of Garza & Palmiotti, San Antonio, TX, for plaintiffs League of United Latin American Citizens, Statewide, Dr. Harold Jones.

William T. Armstrong, III, Foster, Lewis, Langley, Gardner & Banack, Inc., San Antonio, TX, for defendants North East Indep. School Dist., Molly Pruitt, Muriel R. Mc-Donald, Ann Dixon, Dr., William E. McCabe, G. Richard Holt, Dr., Richard Ojeda and Bruce Bennett, in their official capacity as members of Board of Trustees of the North East I.S.D.

### ORDER

SUTTLE, Senior District Judge.

Following a five day bench trial, the Court ordered the parties to file their proposed findings of fact and conclusions of law supported by citation to the trial transcript, exhibits, and case authority. Following a review of the submissions of the parties, the Court found that the record was insufficient to render a ruling as to whether the plaintiffs had satisfied the first prong of the tripartite test set out by the Supreme Court in *Thornburg v. Gingles*.[1] Accordingly, it *sua sponte* ordered that the parties and their attorneys appear on July 24, 1995 so that the Court could obtain the information it desired from Dr. George Korbel, plaintiff's demographics expert. Following this, the Court gave the parties until August 4, 1995 to file their supplemental proposed findings of fact and conclusions of law. The Court is in receipt of the supplemental submissions of the parties and, having reviewed the original submissions as well as the supplemental submissions and the evidence adduced at the trial, enters the following order.

### I. HISTORY OF THE CASE

Dr. Harold Jones and the League of United Latin American Citizens, Statewide ("LU-LAC"), plaintiffs herein, filed their complaint on June 23, 1993. Therein they allege that the at-large voting scheme utilized to elect trustees to the Board of Trustees of the North East Independent School District ("NEISD") in San Antonio, Texas dilutes the voting strength of Hispanic and African–American voters in the school district to effectively deny or abridge their right to participate in the political process and to elect candidates of their choice.[2] This, plaintiffs claim, violates section 2 et seq. of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973 et seq. The present apportionment plan also violates their rights under the Fourteenth and Fifteenth Amendments and 42 U.S.C. § 1983. With regard to relief, plaintiffs seek (1) a declaratory judgment that the at-large election system for electing trustees to the board of trustee of the NEISD is unconstitutional, (2) an injunction prohibiting future at-large NEISD trustee elections, (3) the replacement of the at-large system with a scheme of single-member districts[3], and (4) their attorney's fees and court costs.

---

1. In *Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court articulated a three-pronged test to be applied to vote dilution claims, the first prong of which requires the minority plaintiff to demonstrate that they are sufficiently large and geographically compact to constitute a majority in a single-member district. As explained later in this opinion, the Fifth Circuit has interpreted this to mean that the minority group must be able to draw a single-member district in which they are a majority of the voting age population.

2. The plaintiffs are the League of United Latin American Citizens (and all its Texas members) and Dr. Harold Jones, a Black voting age resident of NEISD. The defendants are NEISD. and the individual trustees. In the May 6, 1995 NEISD school board election Nancy Stratton won the seat held by defendant Muriel McDonald and Marilyn Sorenson won the seat held by defendant Richard Ojeda. Jerry Newton won the seat held by Dr. G. Richard Holt, who elected not to run for reelection.

3. According to Dr. George Korbel, plaintiffs' demographics expert, the N.E.I.S.D. will shortly reach a student population in excess of 64,000 students and thereby fall under the provisions of § 23.01 of TEX.EDUC.CODE ANN. (Vernon's

## II. *JURISDICTION*

Jurisdiction over the parties and the subject matter of this action is noted pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1973 and 1973j(f).

## III. *FINDINGS OF FACT*

1. Each of the named plaintiffs is a resident of NEISD and at all relevant times has been qualified to vote there.[4]

2. NEISD is situated in the North Central and Eastern portion of Bexar County, Texas[5] and is 132 square miles in size.[6]

3. According to the unadjusted 1990 U.S. Census of Population, the total population of Bexar County was 589,180 Hispanic (50.4%), 494,149 Anglo (42.3%), and 84,670 African–American (7.1%).[7]

4. According to the unadjusted 1990 U.S. Census of Population, the Texas Legislative Council and the Texas Education Agency, 254,106 people reside within the boundaries of NEISD.[8]

5. Broken down by race, the population of NEISD is 62,630 Hispanic (24.6 percent), 13,467 African–American (5.3 percent), and 174,570 Anglo (68.7 percent) Anglo. The combined population of Hispanics and African–American within NEISD is 76,097 (29.8 percent).

6. The population of the NEISD election district is larger than that of the election districts of the City of San Antonio (93,593) and the City of Houston (181,173).[9]

7. A candidate running for a seat on the NEISD school board must approach more voters than would a candidate running for the Texas State House of Representatives or the City Council in the City of San Antonio or the City of Houston.[10]

8. The NEISD is the largest school district in Texas which does not elect its trustees from single member districts.[11]

9. If it were a city, the NEISD would rank as the ninth largest city in Texas in terms of population.[12]

10. The NEISD elects a seven person Board of Trustees by place and by a plurality system. The trustees are elected to staggered three year terms so that in one year three trustees will be elected and in each of the succeeding two years two trustees will be elected.[13]

11. At all relevant times the NEISD has elected its Board of Trustees in at-large elections, by place and with a staggered term requirement.[14]

12. As a result of the NEISD School Board election held on May 6, 1995, the NEISD School Board is presently comprised of Jerry Newton,[15] Marilyn Sorenson,[16] Nancy Stratton,[17] Molly Pruitt, Dr. Ann Dixon,

---

Supp.1995) which mandates that any independent school district with 64,000 or more students in average daily attendance shall be governed by a board of nine trustees, seven of which are elected from single-member districts and the other two of which, who shall be the president and vice-president of the school board, are elected at large. *See* Trial Transcript, Volume IV, pages 9–10 (hereinafter "TR. __, p. __").

4. Stipulation No. 1.

5. Stipulation No. 3.

6. Stipulation No. 4.

7. Stipulation No. 5.

8. *See* Plaintiffs' Exhibit 59 (hereinafter "Pls. Exh. __").

9. Pls.Exh. 7.

10. *Id.*

11. TR. IV, p. 7.

12. Pls.Exh. 8–A. The eight cities with populations larger than that of the North East I.S.D. are Houston, Dallas, San Antonio, El Paso, Austin, Fort Worth, Arlington, and Corpus Christi. *Id.*

13. Stipulation No. 8.

14. Stipulation No. 8.

15. Jerry Newton won the seat held by Dr. G. Richard Holt, who did not seek reelection.

16. Marilyn Sorenson won the seat held by defendant Richard Ojeda.

17. Nancy Stratton won the seat held by defendant Muriel McDonald.

William E. McCabe and Bruce Bennett.[18]

13. Dr. Henry Flores, plaintiffs' expert on statistical analysis in the existence of polarized voting and political cohesion among African–Americans and Hispanics within NEISD, is a Professor and Chair of the Department of Political Science at St. Mary's University. Dr. Flores earned a Ph.D. from the University of California, Santa Barbara, Santa Barbara, California in 1981. One of the four areas of focus of Dr. Flores in obtaining his doctorate degree was multivariate statistical analysis.[19] Dr. Flores has consulted and/or offered expert testimony in at least six cases involving the Voting Rights Act[20] and has written and published numerous books, papers and articles on the topic of racial discrimination of Hispanics.[21]

14. Dr. Flores was retained by plaintiffs in this case to determine whether or not racially polarized voting exists in NEISD, the degree of that polarization, and whether or not there is political cohesion among the African–American and Hispanic voters of NEISD.[22]

15. For purposes of his analysis in this case, Dr. Flores studied two types of elections. First, he analyzed any NEISD Board of Trustees election which included a minority candidate and for which there was data available to perform either a bivariate ecological regression analysis ("BERA") or some form of turnout analysis. Dr. Flores also analyzed any exogenous elections that featured a minority candidate against a minority candidate and which covered the whole of NEISD.

16. For purposes of his analyses, Dr. Flores obtained the Voting Age Population ("VAP") for each polling place within the jurisdictional boundaries of NEISD. He also collected the election returns data for as many of the NEISD Board of Trustees elections[23] and exogenous elections[24] which met the above-mentioned criteria.

17. In conducting a BERA, the percentage of the total vote won by each candidate in a given voting precinct is treated as a dependent variable and the percentage of the voting precinct's VAP which is Hispanic, Black + Hispanic, or Anglo is treated as the independent variable.[25]

18. When each data point is plotted, the resulting graph of which is referred to as a scatter plot, a regression line can be drawn through the points. This regression line has a slope. The slope measures the degree of change in the dependent variable produced by one unit change in the independent variable.[26]

19. The regression line intercepts both the left and right vertical axes. The points at which the line intercepts the axes, known as the intercept points, provides a statistical approximation of the percentage of Anglo, Hispanic, and Hispanic and Black voters who voted for a particular candidate. For example, for a regression equation in which the independent variable, located on the horizontal axis, is the percentage of the VAP who are Hispanic, the regression line's intercept through the left vertical axis, which represents the independent variable (% of the total vote received by the candidate), constitutes an estimate of the percentage of voters turning out to vote for the candidate in a precinct having no Hispanic voters. This resulting estimate, known as the Y-intercept, represents an approximation of the number of Anglo voters supporting a given candidate. In other words, as the percentage of Hispan-

18. Stipulation of the parties filed on June 9, 1995.

19. Pls.Exh. 17.

20. TR. II, pp. 18–20.

21. Pls.Exh. 17.

22. TR. II, p. 28.

23. Dr. Flores was able to obtain data suitable for conducting a turnout analysis for NEISD school board elections dating back to 1973. However, only the data from NEISD board elections starting in 1986 was suitable for performing a BERA. TR II, pp. 28–29; Pls.Exh. 38–A and 38–H.

24. The exogenous elections on which Dr. Flores conducted a BERA cover the time period from 1988 to 1992. Pls.Exh. 38–B1, 38–B2 and 38–H.

25. TR. II, p. 21.

26. *Clay v. Board of Education of the City of St. Louis*, 896 F.Supp. 929, 933–34 (E.D.Mo.1995).

ic voters decreases to zero, any votes received by the candidate must have come from Anglo voters. Conversely, for a BERA in which the independent variable is the percentage of the VAP who are Anglo, the line's intercept through the left vertical axis will constitute an estimate of the percentage of Hispanic voters turning out to vote for a particular candidate.[27]

20. Another statistic generated by a BERA is the correlation coefficient, commonly denoted as the "r" or "Pearson's r" statistic. The "r" statistic measures the strength of the relationship between the dependent and independent variable. The "r" ranges from a $-1.0$, indicating an inverse relationship in which the independent variable decreases in direct proportion to any increase in the dependent variable, to $+1.0$, which indicates that the dependent variable increases at the same rate as the independent variable in a positive direction. The nearer the "r" approaches 0.0, the lesser the relationship is between the two variables. According to Dr. Flores, from .4 to .6 is considered a "substantial relationship", from .6 to .8 a "strong relationship", and from .8 to 1.0 an "almost perfect relationship".[28]

21. A BERA also generates the "R2 factor". The "R2 factor" indicates the probability that the coefficient is true or non-random. Most scholars in the field accept only an "R2" with a level of .05 or higher as signifi-

cant.[29] An "R2" of less than .05 is considered unreliable.

22. The BERA of NEISD school board elections featuring a minority candidate produced the following:[30]

### Hispanic VAP

| Year | Candidate | r | r2 | Y Intercept | Stat. Signif. |
|------|-----------|---|-----|-------------|---------------|
| 1986 | Flores + Garcia | .61 | .372 | .062 | .11 [31] |
| 1992 | Ojeda | −.19 | .036 | .66 | .56 [32] |
| 1993 | Miller–Ramos [33] | .5 | .327 | .106 | .0001 [34] |
| 1994 | Miller–Ramos * | .414 | .171 | .129 | .0001 |

*This BERA was based on registered voters.*

### Anglo VAP

| Year | Candidate | r | r2 | Y Intercept | Stat. Signif. |
|------|-----------|---|-----|-------------|---------------|
| 1986 | Flores + Garcia | −.56 | .318 | .637 | .15 |
| 1992 | Ojeda | .45 | .205 | .193[35] | .14 |
| 1993 | Miller–Ramos | −.65 | .417 | .47 | .0001 |
| 1994 | Miller–Ramos | −.41 | .171 | .502 | .0001 |

### Black + Hispanic VAP

| Year | Candidate | r | r2 | Y Intercept | Stat. Signif. |
|------|-----------|---|-----|-------------|---------------|
| 1986 | Flores + Garcia | .564 | .318 | .043 | * |
| 1992 | Ojeda | .452 | .205 | .758 | * |
| 1993 | Miller–Ramos | * | * | * | * |
| 1994 | Miller–Ramos | * | * | * | * |

*Information not provided in plaintiffs' exhibit.*

23. Dr. Flores also analyzed the NEISD school board elections from 1973 to 1994 in terms of the win rate of candidates by race. That study produced the following:[36]

27. TR. II, pp. 24–25.

28. TR. II, p. 23.

29. TR. II, p. 25.

30. Pls.Exh. 38–A and 38–H.

31. Dr. Flores testified that this statistical significance figure is unreliable because this BERA was based on only eight observations (polling places). According to Dr. Flores, the designers of the software program which he used to perform his BERAs advised him that he should have a minimum of ten observations, preferably thirty observations, before doing a BERA. TR. II, p. 40.

32. As with the Flores + Garcia statistical significance figure, Dr. Flores testified that this statistical significance figure is unreliable because the BERA was based on only twelve observations. *Id.*

33. Actually, Miller–Ramos is not Hispanic. However, both Dr. Flores and Dr. Rives, the defendants' expert, assumed, based on her Hispanic surname, that she was Hispanic and considered her as such in performing their studies. TR. II, pp. 34–35.

34. A statistical significance figure of ".0001" means that the result could have occurred by chance only 1 in 10,000 times. TR. II, p. 46.

35. Although this Y–Intercept for Ojeda is shown as ".57" on Pls.Exh. 38–A, Dr. Flores stated during cross-examination that the correct figure is ".19". TR. II, pp. 68–69. Accordingly, Pls. Exh. 38–A has been amended to reflect the correct figure.

36. Pls.Exh. 38–C.

NEISD Board of Trustees
Elections for 1973–1994

| Candidates by Race/Ethnicity | Winners |
|---|---|
| Anglo | 47(36%) [37] |
| | (98%) [38] |
| Hispanic | 1(11%) |
| | (2%) |
| Blacks | 0(0%) |
| | (0%) |

This means that an Anglo candidate was the winner in 47 of 48 elections, a Hispanic candidate in only 1 out of 48 elections, and a Black candidate has never won. Put in terms of percentages, this means that an Anglo was the winner in 98% of the elections, an Hispanic was the winner in only 2% of the elections, and a Black has never won.

24. Dr. Flores prepared another chart showing the results of NEISD school board elections from 1973 to 1994 in terms of the total number of votes received by each candidate, the percentage of total votes received by each candidate, order of finish of each candidate, and the votes needed to win by the losing minority candidate. That chart shows the following: [39]

Elections Results of NEISD Board
of Trustee Races with Minority Candidates

| Year | Candidate | Votes | % Votes | Finish | Votes Needed to Win |
|---|---|---|---|---|---|
| 1973 | O'Connor | 1650 | .436 | 1 | n/a |
| | Delavan | 1609 | .425 | 2 | n/a |
| | Meader | 273 | .07 | 3 | n/a |
| | Dresslar | 146 | .038 | 4 | n/a |
| | Saenz* | 102 | .026 | 5 | 1610[40] |

* This means that even if Saenz had received all the votes of the other two losing candidates, Meader and Dresslar, she still would have finished third.

| Year | Candidate | Votes | % Votes | Finish | Votes Needed to Win |
|---|---|---|---|---|---|
| 1974 | Higginbotham | 1849 | .23 | 1 | n/a |
| | Winn | 1745 | .22 | 2 | n/a |
| | Harris | 1641 | .20 | 3 | n/a |
| | Kendall | 619 | .08 | 4 | n/a |
| | Chaloupka | 371 | .05 | 5 | n/a |
| | Walter | 318 | .04 | 6 | n/a |

| Year | Candidate | Votes | % Votes | Finish | Votes Needed to Win |
|---|---|---|---|---|---|
| | Garza* | 250 | .03 | 7 | 1642[41] |
| | 8 other Anglo candidates | 1266 | .15 | 8–15 | n/a |

* This means that even if Garza had received all the votes of the 8 Anglo candidates who finished below him, he still would not have received enough votes to win one of the three seats up for election.

| Year | Candidate | Votes | % Votes | Finish | Votes Needed to Win |
|---|---|---|---|---|---|
| 1977 | Shaw | 6560 | .257 | 1 | n/a |
| | Winn | 6405 | .25 | 2 | n/a |
| | Harris | 5939 | .23 | 3 | n/a |
| | Higginbotham | 4921 | .19 | 4 | n/a |
| | Garza | 1642 | .06 | 5 | 4298[42] |

| Year | Candidate | Votes | % Votes | Finish | Votes Needed to Win |
|---|---|---|---|---|---|
| 1978 | Wenglein | 2468 | .47 | 1 | n/a |
| | Hallmark | 2326 | .44 | 2 | n/a |
| | Garza | 481 | .09 | 3 | 1988[43] |

| Year | Candidate | Votes | % Votes | Finish | Votes Needed to Win |
|---|---|---|---|---|---|
| 1986 | Everett | 3354 | .51 | 1 | n/a |
| | Flores* | 1522 | .23 | 2 | 1833 |
| | Kimbrough | 981 | .15 | 3 | n/a |
| | Eanes | 574 | .09 | 4 | n/a |
| | Garcia | 121 | .02 | 5 | 3234 |

* This means that Flores would not have won even if he had received all the votes garnered by Kimbrough, Eanes and Garcia. Likewise, Garcia would have lost even if he had received all of the votes received by Flores, Kimbrough and Eanes.

| Year | Candidate | Votes | % Votes | Finish | Votes Needed to Win |
|---|---|---|---|---|---|
| 1992 | Ojeda | 1638 | .58 | 1 | n/a |
| | Saidi | 1203 | .42 | 2 | n/a |

| Year | Candidate | Votes | % Votes | Finish | Votes Needed to Win |
|---|---|---|---|---|---|
| 1993 | Pruitt | 17291 | .55 | 1 | n/a |
| | Hite | 6636 | .21 | 2 | n/a |
| | Miller–Ramos* | 5649 | .18 | 3 | 11643 |
| | Olezene[44] | 1900 | .06 | 4 | 15892 |

* This means that Miller-Ramos would have lost even if she had received all of the votes received by Hite and Olezene. Likewise, Olezene would have lost even if she/he had received all of the votes cast for Miller-Ramos and Hite.

| Year | Candidate | Votes | % Votes | Finish | Votes Needed to Win |
|---|---|---|---|---|---|
| 1994 | McCabe | 6410 | .57 | 1 | n/a |
| | Shackelford[45] | 2192 | .20 | 2 | n/a |
| | Miller–Ramos* | 1808 | .16 | 3 | 4603 |
| | Peppers | 773 | .07 | 4 | n/a |

* This means that Miller-Ramos would not have won even if she had received all of the votes received by Shackelford and Peppers. Likewise, Shackelford would not have won even if she/he had received all of the votes received by Miller-Ramos and Peppers.

25. An analysis of NEISD support for minority candidates in NEISD school board elections in terms of the minimum percent of Hispanic votes received and the maximum percent of Anglo votes received yielded the following figures:[46]

37. This figure represents the percentage of all Anglo candidates that won. TR. II, pp. 50–51.

38. This figure represents the percentage of elections won by race. TR. II, p. 50.

39. Pls.Exh. 38–D1.

40. Two trustees elected.

41. Three trustees elected.

42. Three trustees elected using plurality voting.

43. Plurality elections with place system.

44. Olezene is a Black. TR. II, p. 54.

45. Shackelford is a Black. TR. II, p. 54.

46. Pls.Exh. 38–F.

NEISD Support
For Minority Candidates
Board of Trustees Elections, 1986–1994

| Year | Candidate | Minimum % Hispanic Vote | Maximum % Anglo Vote |
|---|---|---|---|
| 1986 | Flores + Garcia* | .69 | .04 |
| 1992 | Ojeda* | .58[47] | .75 |
| 1992 | Saidi | .42 | .30 |
| 1993 | Miller–Ramos** | .48 | .09 |
| 1994 | Miller–Ramos** | .50 | .13 |

\* *This data was calculated using Voting Age Population.*
\*\* *This data was calculated using Hispanic Registered Voters.*

26. A chart in which Dr. Flores compares, *inter alia*, the preferred candidate of Hispanic voters to the preferred candidate of Black voters in NEISD elections shows the following: [48]

NEISD School Board Elections

| Year | Hispanic Preferred Candidate | Black Preferred Candidate |
|---|---|---|
| 1986 | Bankler | Bankler |
| 1987 | Shacklett | Shacklett |
| 1990 | Pruitt | Chalk |
| 1993 | Ramos | Ramos |

27. Dr. Flores also analyzed NEISD school board elections in terms of the minimum percent of non-Hispanic votes [49] received by Anglo candidates as compared to the percent of non-Hispanic votes received by Hispanic candidates and found the following: [50]

Anglo "Block Voting"
Over–Lapping Percentages

| Year | % Non–Hisp. Registered Voters | % Votes for Hispanic Candidates | Minimum Non–Hispanic Vote for Anglo Candidates | % Votes for Anglo Candidates |
|---|---|---|---|---|
| 1977 | 88% | 6% | 88% − 6% = 82% | 82% |
| 1978 | 88% | 9% | 88% − 9% = 79% | 79% |
| 1986 | 88% | 25% | 88% − 25% = 63% | 63% |
| 1992 | 88% | 58% | 88% − 58% = 30% | 30% |
| 1993 | 87% | 18% | 87% − 18% = 69% | 69% |
| 1994 | 87% | 16% | 87% − 16% = 71% | 71% |

28. Dr. Flores also performed BERAs of exogenous elections [51] with a minority candidates [52], the results of which show the following: [53]

Hispanic VAP

| Year | Candidate | r | r2 | Y Intercept | Stat. Signif. |
|---|---|---|---|---|---|
| 1988 | Gonzalez[54] | .56 | .394 | .32 | .0001[55] |
| 1988 | Canales[56] | .63 | .40 | .21 | .0001 |

**47.** The minimum percent of Hispanic vote for Ojeda was shown to be ".42", while Saidi was shown to have received ".58". However, Dr. Flores testified that these two figures had been inadvertently juxtaposed. TR. II, p. 56. Therefore, the Court has amended Pls.Exh. 38–F to reflect the correct figures.

**48.** Pls.Exh. 49.

**49.** As defined by Dr. Flores, the phrase "percentage of non-Hispanic vote" refers to the percentage of votes received from registered Anglo and Black voters. TR. II, p. 55.

**50.** Pls.Exh. 38–E.

**51.** Dr Flores did not study any party primary elections because the only voters who would participate in the Republican party primaries would be that part of the electorate that traditionally votes for Republicans. The same would hold true for the Democratic party primaries. Only by studying general elections pitting an Anglo against a minority could Dr. Flores conduct a BERA on race based indices. TR. II, pp. 29–30.

**52.** With the exception of Overstreet, who is a Black, all of these candidates are Hispanic. TR. II, p. 43.

**53.** Pls.Exh. 38–B1 and 38–B2.

**54.** Texas Supreme Court, Place 8.

**55.** These figures are based on 142 observations. TR. II, p. 43.

**56.** Bexar County Court of Law, No. 2.

| Year | Candidate | r | r2 | Y Intercept | Stat. Signif. |
|---|---|---|---|---|---|
| 1988 | Rodriguez[57] | .65 | .424 | .23 | .0001 |
| 1988 | Cantu[58] | .64 | .415 | .15 | .0001 |
| 1988 | Mireles[59] | .68 | .462 | .21 | .0001 |
| 1988 | Garza[60] | .66 | .433 | .34 | .0001 |
| 1990 | Morales[61] | .60 | .361 | .49 | .0001 |
| 1992 | Guerrero[62] | .76 | .574 | .13 | .0001 |
| 1992 | Overstreet[63] | .70 | .487 | .24 | .0001 |
| 1992 | Benavides[64] | .57 | .321 | .26 | .0001 |
| 1992 | Gabriel[65] | .65 | .425 | .27 | .0001 |
| 1992 | Roman[66] | .63 | .402 | .31 | .0001 |
| 1992 | Lopez[67] | .56 | .318 | .38 | .0001 |

### Anglo VAP

| Year | Candidate | r | r2 | Y Intercept | Stat. Signif. |
|---|---|---|---|---|---|
| 1988 | Gonzalez | −.56 | .316 | .64 | .0001 |
| 1988 | Canales | −.62 | .382 | .61 | .0001 |
| 1988 | Rodriguez | −.62 | .384 | .53 | .0001 |
| 1988 | Cantu | −.64 | .405 | .53 | .0001 |
| 1988 | Mireles | −.65 | .420 | .62 | .0001 |
| 1988 | Garza | −.63 | .402 | .71 | .0001 |
| 1990 | Morales | −.63 | .396 | .76 | .0001 |
| 1992 | Guerrero | −.81 | .651 | .69 | .0001 |
| 1992 | Overstreet | −.75 | .560 | .75 | .0001 |
| 1992 | Benavides | −.61 | .365 | .73 | .0001 |
| 1992 | Gabriel | −.72 | .365 | .73 | .0001 |
| 1992 | Roman | −.72 | .519 | .88 | .0001 |
| 1992 | Lopez | −.63 | .395 | .78 | .0001 |

29. A comparison of the candidate preferred by Hispanics with the candidate preferred by Blacks in exogenous elections shows the following: [68]

### City of San Antonio

| Year | Hispanic Preferred Candidate | Black Preferred Candidate |
|---|---|---|
| 1985 | Cisneros | Cisneros |
| 1987 | Cisneros | Cisneros |
| 1989 | Cockrell | Cockrell |
| 1991 | Berriozabal | Berriozabal |
| 1993 | Wolff | Wolff |

### General Elections

| Year | Hispanic Preferred Candidate | Black Preferred Candidate |
|---|---|---|
| 1986[69] | Lee | Lee |
| 1986[70] | Cisneros | Cisneros |
| 1990[71] | Rodriguez | Rodriguez |
| 1990[72] | Rivera | Rivera |
| 1992[73] | Offutt | Coulter |

Thus, Blacks and Hispanics preferred the same candidate in all 5 city elections and 4 of the 5 general elections.

30. A study of NEISD support for minority candidates in exogenous elections in terms of the minimum percent of Hispanic vote received and the maximum percent of Anglo vote received was as follows: [74]

### NEISD Support For Minority Candidates General Elections, 1986–1994

| Year | Candidate | Minimum % Hispanic Vote | Maximum % Anglo Vote |
|---|---|---|---|
| 1988 | Gonzalez | .71 | .32 |
| 1988 | Canales | .67 | .20 |
| 1988 | Rodriguez | .58 | .23 |
| 1988 | Cantu | .58 | .15 |
| 1988 | Mireles | .69 | .20 |
| 1988 | Garza | .76 | .34 |
| 1990 | Morales | .78 | .49 |
| 1992 | Guerrero | .73 | .11 |
| 1992 | Overstreet | .78 | .22 |
| 1992 | Benavides | .76 | .24 |
| 1992 | Gabriel | .85 | .24 |
| 1992 | Roman | .89 | .28 |
| 1992 | Lopez | .80 | .36 |

This means that the minority candidate in exogenous elections received, on average, a maximum of 26% of the Anglo vote in NEISD and a minimum of approximately 74% of the Hispanic vote in NEISD.

31. Several facts are undeniable in light of the results of the analyses performed by Dr. Flores.

32. First, there is a high degree of cohesion among Hispanic voters in NEISD.

57. Bexar County Sheriff.

58. Texas Court of Appeals, District 4, Place 1.

59. 37th Judicial District Court.

60. Bexar County Tax Assessor–Collector.

61. Texas Attorney General.

62. Texas Railroad Commission, Place 3.

63. Texas Court of Criminal Appeals, Place 4.

64. Texas Court of Criminal Appeals, Place 6.

65. 131st Judicial District Court.

66. 175th Judicial District Court.

67. Bexar County Sheriff.

68. Pls.Exh. 49.

69. Bexar County Commissioner.

70. State District Judge.

71. Bexar County District Attorney.

72. State District Judge.

73. State Board of Education.

74. Pls.Exh. 38–G.

33. Second, there is a high degree of cohesion among Hispanic and Black voters in NEISD.

34. Third, there is a high degree of cohesion among Anglo voters in NEISD.

35. Fourth, there is a clear and persistent history of racially polarized voting in both NEISD school board elections as well as in exogenous elections as evidenced by the fact that Anglo voters have consistently voted together in large percentages for Anglo candidates while Hispanic and Black voters have voted together for either the Hispanic or Black candidate.

36. Fifth, Anglos have consistently voted together for the Anglo candidate in such large percentages that the minority candidate, despite receiving a relatively significant percentage of minority votes, has rarely received enough Anglo crossover votes to win.

37. Sixth, the correlation between the race of the voter and the voter's choice of candidate is statistically significant and cannot be attributed to chance.

38. Dr. William Rives, defendants' expert, testified that his analyses of NEISD school board elections and exogenous elections failed to reveal the existence of racially polarized voting in the NEISD, bloc voting by Anglo voters to defeat the preferred candidate of minority voters, or cohesion among Hispanic and Black voters.[75] However, this Court, for the reasons set forth below, finds that Dr. Rives' testimony is not credible.

39. First, Dr. Rives used the voting age population, not the actual turnout at the polls, as his independent variable.[76] However, on cross examination, Dr. Rives admitted that the best measure of the independent variable is actual turnout at the polls, and the second most accurate data is voter registration data by precinct and ethnicity.[77]

40. Second, in trying to discern the existence of racially polarized voting in NEISD, Dr. Rives, unlike Dr. Flores, limited his analysis to NEISD school board elections.[78] And, unlike Dr. Flores, Dr. Rives did not restrict his analysis to only those elections in which there was a minority candidate running against an Anglo candidate. Instead, he looked both at elections pitting an Anglo candidate against a minority candidate as well as elections having only Anglo candidates.[79] However, on cross-examination, Dr. Rives admitted that this method of analysis was inconsistent with the method of analysis used by Dr. Bernard Groffman, whose analysis was approved by the Supreme Court in *Gingles*, as well as that of Dr. Alan Lichtman, Dr. Albert Table, Dr. Robert Brischetto, all of whom are recognized experts in the field of racially polarized voting.[80]

41. What is more, Dr. Rives accorded the same weight to an Anglo–Anglo election as he did to an Anglo-minority election despite acknowledging that doing so is contrary to the Fifth Circuit's observation in *Citizens for a Better Gretna v. City of Gretna*[81] that, "*Gingles* is properly interpreted to hold that the race of the candidate is in general of less significance than the race of the voter—but only within the context of an election that offers voters the choice of supporting a viable minority candidate."[82]

42. The value of Dr. Rive's opinion is further diminished by the fact that, although he analyzed general elections, he did not rely on the results of those analysis in formulating an opinion as to the existence of racially polarized voting. According to Dr. Rives, the reason he did not rely on those results is because such elections are partisan elections. Yet, Dr. Rives admitted during cross-examination that, although it was possible to do so, he had not done a multi-variate analysis to determine the effect that party affiliation had

75. TR. V, p. 187.

76. TR. VI, p. 48.

77. TR. VI, pp. 48–50.

78. TR. VI, pp. 56–57.

79. TR. V, p. 186; Defendants' Exhibit 7 (hereinafter "Dfs. Exh. ___").

80. TR. VI, pp. 54–56.

81. 834 F.2d 496, 503 (5th Cir.1987).

82. TR. VI, p. 54.

on the results.[83] He also conceded that he had failed to perform a BERA on the primary elections as had been done by Dr. Gibson, plaintiffs' expert, to measure the impact of party affiliation on the results of general elections.[84]

43. With respect to his opinion that there is no cohesion among Hispanic voters in NEISD, Dr. Rives testified that this conclusion was based on the fact that his analysis showed that Hispanic voters, with the exception of the 1986 election, never gave a candidate a majority of their vote, but instead spread their votes among all candidates.[85] Yet, when pressed on cross-examination about what he considered to be an indication of cohesion of minority voters in a plurality election system, Dr. Rives agreed that expressing a clear preference for a candidate does not necessarily mean that a candidate must have received a majority of the minority votes.[86] Using that standard, it is obvious that Hispanics have voted cohesively in almost every NEISD school board election from 1986 to 1994. In 1986, Bankler received 78.1% of the Hispanic vote for place 5, Everett received 49.8% for Place 6, and Lampert received 66.4% for place 7. In 1987, Shacklett received 60.9% of the Hispanic vote for place 1, and Pruitt received 58.6% for place 2. In 1988, Coulter received 53.5% of the Hispanic vote for place 3, while McDonald received 46.1% for place 4. In 1989, McDonald received 41.7% of the Hispanic vote for place 5, Caldarola received 46% for place 6, and Ogden received 57% for place 7. In 1990, Bray received 44.2% of the Hispanic vote for place 1, and Pruitt received 71.7% for place 2. In 1991, McCabe received 80.2% of the Hispanic vote for place 3, while Saidi received 49% for place 4. In 1992, Ojeda received 58.6% of the Hispanic vote for place 6. In 1993, Bennett received 69.1% of the Hispanic vote for place 1, while Ramos–Miller received 45.9% for place 2. In 1994, Ramos–Miller received 41.9% of the Hispanic vote for place 3, while Gamble received 46.8% for place 4.[87]

44. Dr. Rives' conclusion that there is no cohesion between Black and Hispanic voters in NEISD is likewise suspect because it is based only on his study of school board elections. As noted earlier, Dr. Rives disregarded the results of the analysis he performed on the general elections because he assumed that party affiliation, rather than race, accounted for the results in such elections. However, Dr. Rives performed no multi-variate analysis that would have proved or disproved this assumption.[88] More importantly, Dr. Rives admitted that his analysis of the general elections showed, *inter alia*, both that Hispanics and Blacks generally vote together and that they vote differently than Anglo voters in NEISD.[89]

45. With respect to whether Anglos vote sufficiently as a bloc to usually defeat the preferred candidate of the Hispanic and Black voters of NEISD, one need only look at the results of the NEISD school board elections featuring a minority candidate from 1973 to 1994, as set forth in Pls.Exh. 38–D, 38–E and 38–F, to realize that the Anglo voters of NEISD consistently vote as a bloc to defeat the preferred candidate of the Hispanics and Blacks in NEISD school board elections.

46. As calculated by Dr. Korbel, the total population of NEISD is 261,172.[90] If

---

83. TR. VI, p. 57.

84. TR. VI, p. 58.

85. TR. VI, pp. 5–11.

86. TR. VI, p. 64.

87. Dfs.Exh. 7. The 1986–1988 and 1991 results are based on election-day returns, while all other results are based on total results. Dfs.Exh. 7.

88. TR. VI, p. 57.

89. TR. VI, p. 58.

90. According to Dr. Korbel, the reason the total population figure used by him is 261,172 instead of 254,106, the total population figure of NEISD according to the unadjusted 1990 Census, is that he utilized whole "census block", the smallest unit of the 1990 Census, in drawing the proposed districts. This means that whenever a census block was divided by the NEISD boundary, Dr. Korbel treated the entire census block as being within the NEISD boundary lines and included the total population of the census block in the total population figure of NEISD. TR. IV, pp. 58–60.

NEISD were divided into seven equally populated districts, each district would ideally contain 37,310 people. One of those proposed districts, Proposed District No. 3, would be a district in which the combined Hispanic and Black VAP would constitute a majority of the VAP.

47. As calculated by Dr. Korbel, the VAP of Proposed District 3 would be 49% Hispanic, 3% Black, and 46.8% Anglo.[91]

48. However, defendants have attacked the method by which Dr. Korbel calculated the population of Proposed District 3. Specifically, Dr. Tucker Gibson, the defendants' demographics expert, testified that the correct method of calculating the population in census blocks split by NEISD's boundaries is to determine the housing counts in split portions of the census block and then allocate the population of the census block in accordance with the percentage of the housing units in the parts of the split census blocks. Using this method of calculation, Dr. Gibson arrived at the following population figures for NEISD and Plaintiffs' Proposed District 3: [92]

### NEISD Total Population

| | | |
|---|---|---|
| Total: | 253,582 | (100%) |
| Anglo: | 173,349 | (68.4%) |
| Hisp.: | 62,454 | (24.6%) |
| Black: | 12,559 | (5%) |
| Other: | 270 | (.1%) |

### NEISD Voting Age Population

| | | |
|---|---|---|
| Total VAP | 189,659 | (100%) |
| Anglo: | 134,909 | (52.7%) |
| Hisp.: | 42,459 | (22%) |
| Black: | 8,391 | (4%) |
| Other: | 168 | (.09%) |

### Proposed District 3 Total Population

| | | |
|---|---|---|
| Total: | 33,856 | (100%) |
| Anglo: | 14,222 | (42%) |
| Hisp.: | 18,102 | (53.5%) |
| Black: | 1,084 | (3.2%) |
| Other: | 448 | (1.3%) |

### Proposed District 3 Voting Age Population

| | | |
|---|---|---|
| Total VAP | 24,719 | (100%) |
| Anglo: | 11,592 | (46.9%) |
| Hisp.: | 12,094 | (48.9%) |
| Black: | 677 | (2.7%) |
| Other: | 356 | (1.4%) |

49. Thus, as Dr. Gibson conceded, even using his method to calculate the total population and VAP of both NEISD and Plaintiffs' Proposed District 3, the Plaintiffs' Proposed District 3 would still contain a combined Hispanic and Black VAP of 51.6%. In short, it would contain a minority majority of the VAP of Proposed District 3.

50. Defendants further contend that plaintiffs should be required to show that they would constitute a majority of the voting age citizenship population in Proposed District 3.

51. However, Dr. Korbel testified that in all the years he has been involved in drawing redistricting plans and submitting them for clearance by the Department of Justice, no redistricting plan has been rejected for failing to take citizenship into account.[93]

52. Likewise, Dr. Rives, defendants' own expert, conceded that he knew of no case authority requiring the plaintiffs to show that they comprise a majority of the citizen voting age population in a proposed single-member district. That requirement, Dr. Rives admitted, was imposed by him only at the direction of defense counsel.[94]

53. The Fifth Circuit, by whose holdings this Court is bound, has repeatedly held that plaintiffs in a § 2 case need only show that they can draw a proposed district in which they comprise a majority of the voting age population in order to satisfy the first prong of *Gingles*.[95]

91. Pls.Exh. 6, p. 19.

92. Dfs.Exh. 3, 4 and 6.

93. TR. II, p. 163.

94. TR. VI, pp. 32–33.

95. See *LULAC v. Clements*, 986 F.2d 728, 743 (5th Cir.1993), *rev'd on other grounds*, 999 F.2d 831 (5th Cir.1993) (en banc), (to satisfy first *Gingles* factor, the minority group must ordinarily be able to draw a single member district in which a majority of the *voting age population* is minority) (emphasis in original); *Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109, 1117 n. 6 (5th Cir.1991) ("*Westwego II*"); *Brewer v. Ham*, 876 F.2d 448, 451 (5th Cir.1989) (affirming district court's entry of

54. Likewise, except for a lone case decided after the trial in this matter [96], the district courts in the Fifth Circuit, in evaluating whether plaintiffs in a vote dilution case have satisfied the first prong of *Gingles*, have required only that the plaintiffs prove that they would constitute a minority majority of the voting age population in at least one proposed district.[97]

55. The Court finds that the plaintiffs have shown that they can draw a proposed single member district in which Hispanics and Blacks constitute a majority of the voting age population, as evidenced by Plaintiffs' Proposed District 3.[98]

56. The Court also finds that the Plaintiffs' Proposed District 3 is geographically compact. With regard to the shape of Plaintiffs' Proposed District 3, the Court finds that the two-headed dragon configuration is not the result of racial gerrymandering, but is due in large part to the plaintiffs having to draw around the northern boundary of the Alamo Heights Independent School District.[99,100]

57. Plaintiffs also have shown that voting in NEISD school board elections is significantly polarized along racial lines.

58. As noted earlier, of the 48 candidates elected to the NEISD Board of Trustees

judgment for defendants due to failure of minority plaintiffs to propose a single-member district within the school district that would contain a majority of the voting age population of a minority group including Blacks, Hispanics, and Asians); *Westwego Citizens for Better Government v. Westwego*, 872 F.2d 1201, 1205 n. 4 (5th Cir.1989) (*"Westwego I"*) (noting that evidence of size of "voting age" population is critical to a vote dilution claim); *Overton v. City of Austin*, 871 F.2d 529, 535–36 (5th Cir. 1989) (affirming judgment of district court in which district court found, *inter alia*, that neither Black nor Hispanic plaintiffs constituted a majority of the voting age population); *Houston v. Haley*, 859 F.2d 341 (5th Cir.1988), *vacated on other grounds*, 869 F.2d 807 (1989), (where the court referred to this issue as "critical").

96. *Campos v. City of Houston*, 894 F.Supp. 1062 (S.D.Tex.1995) (finding, in granting the defendant City of Houston's motion for summary judgment, that, in analyzing the first prong of the *Gingles* test, using the data of voting age Hispanic citizens is the correct measure of the Hispanic population's ability to create a majority voting district). *Id.* at 1065.

97. *See Concerned Citizens for Equality v. McDonald*, 863 F.Supp. 393, 402 (E.D.Tex.1994) (analysis assumes that the appropriate analytical and remedial standard is bare majority of voting age population); *Clark v. Roemer*, 777 F.Supp. 445, 452–452 (M.D.La.1990) ("[a]lthough the Fifth Circuit has not yet squarely so held, it seems rather clear that the majority population with which *Thornburg v. Gingles* is concerned is a voting majority, not simply a population majority. The court of Appeals has at least implied that the single-member district which is created must contain at least a *voting age majority* of the minority group … This court concludes that in order to be viable under the *Thornburg v. Gingles* rationale any such district must contain at least a voting age majority of the minority group.") (emphasis in original); *Ewing v. Monroe County, Mississippi*, 740 F.Supp. 417, 419 (N.D.Miss. 1990) (distribution of blacks through county

meets the first prerequisite so as to allow the creation of at least one supervisory district and one justice court judge district with a majority black voting population) (emphasis in original); *Williams v. City of Dallas*, 734 F.Supp. 1317, 1387 (N.D.Tex.1990) (with a 65% African–American concentration, there can be 3 black districts out of 8, 4 out of 10 or 11, and 5 out of 15—with a majority African–American *voting age population*) (emphasis in original).

98. Pls.Exh. P–3 and P–4.

99. The shape of Plaintiffs' Proposed District 3 is no more disjointed or contorted than the district approved by the district court in *Hastert v. State Bd. of Elections*, 777 F.Supp. 634 (N.D.Ill.1991) (holding that Chicago/Cook County's Hispanic community was geographically compact within the meaning of *Gingles* to constitute a single district majority despite fact that proposed district encompassed separate Hispanic enclaves in northwest and southwest corners of Chicago, and ran narrow corridor connecting those enclaves around end of existing congressional district, and had "rays" "shooting out" to capture additional Hispanic population, with resulting district that resembled "Rorschach blot" turned on its side; therefore, proposed Hispanic congressional district, although uncouth in configuration, would be approved). Plaintiffs' Proposed District 3 is also distinguishable from the proposed district rejected by the district court in *East Jefferson Coalition for Leadership and Development v. Parish of Jefferson*, 691 F.Supp. 991 (E.D.La.1998), *aff'd* 926 F.2d 487 (5th Cir.1991). There the proposed district crossed the Mississippi River, a major natural boundary, and reached around the airport to include a concentration of black voters living above the airport. Plaintiffs' Proposed District 3, on the other hand, does not cross a major natural boundary nor does it branch out in an unacceptable manner in an effort to take in an isolated concentration of minority voters.

100. TR. IV, p. 26; Pls.Exh. P–3.

between 1973 and 1994, 47 are Anglo and 1 is Hispanic. Stated in percentages, this means 98% of all winners in NEISD school board elections in the past 21 years are Anglo, while 2% are Hispanic. Of the Anglo candidates who have run, 36% were winners. By contrast, only 11% of Hispanic candidates won, while no Black candidate has ever won.[101]

59. Absent special circumstances, there are not enough Anglo cross-over votes to allow a minority candidate to succeed in the at-large election system presently used in NEISD school board elections.

60. Richard Ojeda, the only Hispanic candidate to be elected to the NEISD school board, ran against a woman with an Iranian-sounding name, Brigetta Saidi[102], in 1992, shortly after the Persian Gulf War.[103]

61. Ojeda was elected with the support of the Positive Direction Committee ("PDC"), a slating group of Anglos within NEISD[104], and the support of at least one Anglo trustee, Bill McCabe.[105]

62. Ojeda lost in his bid for reelection in May of 1995.[106]

63. The PDC was formed in 1988–89 and was comprised entirely of Anglos.[107] There is no evidence a minority ever served on the PDC.

64. There is no evidence that NEISD school board campaigns have been characterized by overt or subtle appeals to race.

65. There is no dispute that Texas has a long history of discrimination against its Black and Hispanic citizens in all areas of public life. Dr. Korbel testified in a general fashion that minority citizens had been subjected to discriminatory voter registration laws, poll taxes, racially restrictive covenants in real estate transactions[108], and segregated schools in the past.[109] However, the plaintiffs have offered no evidence in the form of empirical data that shows that Blacks and Hispanics in NEISD currently register to vote at a lower rate than Anglos, that the turnout level of Blacks and Hispanics is lower than that of Anglos in NEISD, or any other factor which would demonstrate that past discrimination has hampered the ability of Blacks and Hispanics in NEISD to participate presently in the political process.

66. The 1990 Census shows that 2,734 (8.9%) Hispanics over the age of 25 in NEISD were functionally illiterate or had completed less than 8 years of formal education. The functional illiteracy rate of Anglos, on the other hand, was only 3.1%.[110]

67. The 1990 Census also reflects that only 8,031 Hispanics within NEISD were high school graduates as compared to 30,496 Anglos. Only 1,323 Blacks were high school graduates.[111]

68. With respect to college graduates, the 1990 Census showed that 28,401 (82.1%) of the residents of NEISD with a college degree were Anglo, 4,230 (12.3%) of NEISD residents with a college degree were Hispanic, and 958 (3.1%) of NEISD residents with a college degree were Black. In other words, 80% of the holders of college degrees in NEISD are Anglo.[112]

69. With respect to graduate and professional degrees, Anglos comprise 83.8% of the people in NEISD with graduate or professional degrees. Hispanics hold only 9.8% and Blacks 3.9%.[113]

---

101. TR. II, pp. 50–51.

102. However, Ms. Saidi is actually of German descent. TR. I, p. 212.

103. TR. I, p. 49.

104. TR. IV, pp. 223–224.

105. TR. V, p. 30.

106. *See* the post-trial submission of parties stipulating to the 1995 NEISD school board election returns. Docket No. 65.

107. TR. I, pp. 47–48, 88.

108. Pls.Exh. 53.

109. TR. II, p. 170.

110. Pls.Exh. P–9 and P–13.

111. Pls.Exh. P–1.

112. Pls.Exh. P–1, P–12, and P–14.

113. Pls.Exh. 11.

70. With respect to the percentage of each race which lives below the poverty level, the 1990 Census revealed that 20.4% of the Black families in NEISD live below the poverty level; that 14.2% of Hispanic families lived below the poverty level; and 7% of the Anglo families existed below the poverty level.[114]

71. According to the 1990 Census, the mean income for Anglo households in NEISD was $44,258.00, the mean income for Hispanic households in NEISD was $34,-109.00, and the mean income for Black households in NEISD was $29,787.00. Thus, the mean income for Anglo households in NEISD was approximately 129% that of Hispanic households and 149% that of Black households.[115]

72. The 1990 Census also shows that 30.6% of Anglo households in NEISD have annual income levels exceeding $50,000 as compared to only 15% of Black households and 18.2% of Hispanic households.[116]

73. The 1990 Census further shows that only 16.1% of Anglo households in NEISD have an annual income of less than $15,000. By way of contrast, 29.4% Black households and 22.3% Hispanic households fall below that level.[117]

74. With respect to the average per capita income, the 1990 Census indicates that Anglos in NEISD earned $18,364 while Blacks and Hispanics earned $11,661 and $11,216, respectively.[118] In other words, Anglos earn almost 160% the per capita income of Hispanics and Blacks.

75. The scores of NEISD Black and Hispanic students generally are considerably lower than the scores of NEISD Anglo students on the Texas Assessment of Academic Skills exam[119], the standardized test administered by the Texas Education Agency each year to all school students in Texas.[120]

76. The Court finds that plaintiffs have shown that Blacks and Hispanics still bear the effects of past discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

77. Contrary to plaintiffs' assertions otherwise, the Court finds that the plaintiffs have not proved that NEISD has a history of being unresponsive to the concerns or needs of its minority community.

78. Plaintiffs claim that the naming of an athletic center of Virgil T. Blossom, an alleged racist, as evidence of the school district's insensitivity. However, the plaintiffs' assertion that Blossom was a racist is not supported by any credible evidence. What is more, Jesse Culter, who served on the NEISD school board three years, one of which as president, testified that he never even attempted to place on the agenda for consideration by the school board the renaming of the Virgil T. Blossom Athletic Center.[121]

79. Plaintiffs also cite the fact that Robert E. Lee High School flew the Confederate flag until 1993 as evidence of the school district's insensitivity to minorities. Once again, however, the evidence shows that no one ever approached the school board and requested that the flag not be flown.[122] Likewise, Culter admitted that he never asked that the issue be placed on the board's agenda during the three years he served as trustee.[123] What is more, when students at the high school did voice their displeasure about the Confederate flag being flown, Bill Fisch, the principal at Lee High School, ordered that the flag not be flown and that a different symbol be used.[124]

114. Pls.Exh. P–10.

115. Pls.Exh. P–1.

116. Pls.Exh. P–1, P–14.

117. Pls.Exh. P–1, P–15.

118. Pls.Exh. P–1, P–16.

119. Pls.Exh. P–22A, P–23, P–24, P–26A, P–26B, P–28, P–29, P–30, P–31, P–23, P–35.

120. TR. IV, p. 145.

121. TR. I, p. 58.

122. TR. IV, p. 205.

123. TR. I, p. 58.

124. TR I, p. 211.

80. Plaintiffs also claim that the school district's administration blocked efforts by board members to review the at-large election system. Yet, Culter admitted on cross-examination that he never attempted to place the issue of single-member districts on the school board's agenda while he was a trustee [125] or since leaving the board in 1991.[126]

81. Another indication of the school district's insensitivity, according to plaintiffs, is the use of race in drawing school attendance zones for Castle Hills Elementary and Redland Oak Elementary school. However, Dr. Middleton testified that all school attendance zones, including those for Castle Hills Elementary and Redland Oak Elementary, are created strictly on the basis of the number of students.[127] With reference to Castle Hills Elementary, Dr. Middleton testified that it is a school of choice, meaning that students from a seven elementary school region can elect to attend it, regardless of race or ethnicity.[128]

82. Plaintiffs also claim that the school district has displayed its insensitivity by failing to actively recruit minority teachers. While plaintiffs have introduced evidence that NEISD did not actively recruit Hispanics and Blacks until recently, defendants have come forth with evidence that since 1992 the school district has intensified its efforts to attract minority teachers by recruiting not only from Texas universities and colleges, but also to New York and California.[129] However, as Dr. Middleton pointed out, the school district is confronted with the reality that fewer minorities are pursuing a profession in teaching.[130] This also undercuts Plaintiffs' argument that the school district is insensitive to the needs of its minority population because it employs a teacher work force that is less than 10% Hispanic and less

than 2% Black when its student population is nearly 40% minority. Plaintiffs have offered no evidence that the low level of minority teachers in NEISD is attributable to any insensitivity on the part of the school district rather than a small pool from which to recruit minority teachers.

83. Another manifestation of the school district's insensitivity, Plaintiffs argue, is the scarcity of Hispanics in administrative positions. As evidenced by Plaintiffs' Ex. P-18, of the 150 administrators in the school district, only 14 are Hispanic.[131] However, Dr. Middleton, who is part Hispanic himself,[132] also testified that there are 29 minority administrators in the school district, 18 of whom have been appointed since he was appointed as Superintendent in 1989.[133] Therefore, while it may be true that Dr. Middleton's predecessors impeded the advancement of minorities to administrative positions, the Court does not find the evidence to substantiate this allegation as to Dr. Middleton.

84. Plaintiffs also offer the fact that none of the four assistant superintendents is a minority [134] as another example of the lack of responsiveness by NEISD to the concerns of its minority population. Yet, plaintiffs failed to offer any evidence as to when and by whom these people were appointed, what their qualifications are in terms of experience and education, or anything else that would support this allegation.

85. Another example of non-responsiveness by the school district, contend plaintiffs, is the establishment of boundary lines that result in Lee High School having a student population which is 56% minorities while Churchill High School has a student population that is less than 25% minorities even though the two school share a common

125. TR. I, p. 70. Dr. Richard Middleton, who was Superintendent of NEISD at the time Culter served on the school board, recalled that Culter never asked him to place the single-member issue on the board's agenda. TR. IV, p. 168–169.

126. TR I, p. 76.

127. TR. IV, pp. 171–172.

128. TR. IV, p. 170.

129. TR. IV, pp. 165, 181.

130. TR. IV, p. 165.

131. Pls.Exh. P–18.

132. TR. IV, p. 181.

133. TR. IV, pp. 165–166.

134. TR. IV, p. 182.

boundary line and are less than five miles apart.[135] As pointed out by Dr. Middleton, however, school boundaries are drawn based on the number of students each school can accommodate, not with an eye toward creating a racially balanced student body. Also, what plaintiffs' argument ignores is the testimony of Dr. Korbel, their own expert, that the heaviest concentration of Hispanics in NEISD is in the southern portion of Plaintiffs' Proposed District 3, where Lee High is located, due to the migration of Hispanics into the area during the last decade as Anglos have moved out to new developments on the north side of the school district.[136] This, rather than any insensitivity on the part of the school district, would account for the large number of minority students in Lee High School as compared to Churchill.

86. Plaintiffs also see a lack of responsiveness by the school district to the needs of its minority students in the fact that Dr. Richard Holt, the President of the school board at the time of this trial, testified that it was possible for a student to attend school in NEISD for 12 years without ever having a minority teacher. However, Dr. Holt also testified that the NEISD teaching staff is very stable with very little turnover. He also noted, as did Dr. Middleton, that there is a limited pool of minority teachers and administrators from which the school district can recruit.[137] Moreover, as Richard Ojeda pointed out, the school district is also at a disadvantage by virtue of the fact that it must compete with other school districts, such as Alamo Heights, which can offer higher salaries to attract minority teachers.[138] Given these other factors, the Court cannot

blame the low percentage of minority teachers in NEISD on any lack of concern or effort to remedy the situation by the school district.

87. Plaintiffs cite the testimony of Dr. Jones, the African–American plaintiff, that the school board has a long history of discrimination against African–Americans as evidence of its unresponsiveness to the minority community. However, the discrimination of which Dr. Jones testified referred to discrimination that occurred when he attended school in the 1940s and to the discrimination that existed in 1960s.[139] Dr. Jones related no incidents of discrimination by the current school board.

88. The final example of school board insensitivity offered by the Plaintiffs is the poor performance of minority students on the TAAS exams. There is no dispute that the TAAS results of minority students in NEISD are not disconcerting. However, plaintiffs have not pointed to any evidence of the school board ignoring the problem or not taking steps to better prepare minority students for the TAAS exam. In fact, the evidence put on by the defendants compels the exact opposite conclusion. A broad range of programs have been enacted by the school district which are designed to identify and address the educational needs of students, including minority students, who are struggling in class and who are at risk of failing or dropping out.[140]

89. Until 1990, there were only eight polling place within NEISD for school board

135. Pls.Exh. P–21A.

136. TR. II, pp. 157–160.

137. TR. IV, p. 206.

138. TR. IV, p. 219.

139. TR. I, pp. 134–135.

140. Such programs include jump start programs for schools with a high percentage of students receiving free or reduced-price lunch; bilingual programs; mentoring programs in which businesses in the community work with children

identified as being at risk of dropping out;, high order thinking skills programs aimed at attracting minority students into gifted and talented programs; a year-round curriculum at Nimitz Academy and Castle Hills Elementary School, both of which have a large minority student population; the A–B schedule at White Middle School, a program in which students attend class every other day for 1.5 hours so they can do their homework in class; and the Lee Volunteer for Excellence Program at Lee High School, which encourages students to take higher levels of math at an earlier age. NEISD has also developed remedial programs specifically designed to help students who have trouble with certain sections of the TAAS exam. TR. IV, pp. 150–154.

elections, even though the school district contains over 250,000 people.[141]

90. NEISD currently utilizes a place system to elect its trustees, a voting device which prevents "single-shot" voting by minority voters.[142]

91. Generally speaking, minority candidates have more limited resources with which to finance their campaign than do Anglo candidates in NEISD.[143]

92. It is more expensive to run for office in the current at-large system used by NEISD than it would be to run for office in a single-member district system as proposed by plaintiffs.

93. The sheer geographical size of NEISD makes it virtually impossible for a minority candidate to conduct a grass roots or door-to-door campaign. Such a campaign could be conducted, however, in a single-member district.[144]

94. A study by the U.S. Commission on Civil Rights reveals that Texas jurisdictions that have adopted single-member districts have experienced a two or three-fold increase in the number of elected minority candidates.[145]

95. That same study also looked at coalition voting patterns in Texas and found that districts in which the Black and the Hispanic populations, when combined, exceed 50% of the population are characterized by Blacks and Hispanics voting together for minority candidates. Such districts, the study showed, also elect more minority candidates than does a single Black or a single Hispanic district of the same total percentage.[146]

96. Dr. Gibson, defendants' expert, has written scholarly articles in which he reported finding that a coalition had developed between Blacks and Hispanics of Bexar County in the 1960s and 1970s and that a plurality district of Blacks and Hispanics has consistently elected black candidates in city

council and state legislative elections throughout the 1970s, 1980s and 1990s.[147]

## IV. CONCLUSIONS OF LAW

1. In 1982, Congress amended § 2 of the Voting Rights Act "to clearly establish the standards ... for proving a violation of that section." S.Rep.No. 97–417, 97th Cong., 2d Sess. 2, reprinted in 1982 U.S.Code Cong. & Admin.News pp. 177, 178.

2. Section 2, as amended, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color or in contravention of the guarantees set forth in section 1973b(f) of the title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to the participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis in original).

 In other words, any electoral mechanism which dilutes the voting strength of a minority group is as impermissible a denial

141. TR. I, pp. 36–37.

142. TR. II, p. 173.

143. TR. I, p. 101.

144. TR. I, pp. 100–101.

145. TR. II, pp. 126–127.

146. TR. II, pp. 127–128.

147. TR. V, pp. 133–136.

of the right to have one's ballot count fully as the denial of the right to vote. S.Rep. at 28, 1982 U.S.Code Cong. & Admin.News at 205.

■ 3. The aim of the Voting Rights Act is to prevent political bodies from implementing election systems or practices which act, whether intentionally or not, to minimize, cancel, or dilute the voting strength or political effectiveness of minority groups.

■ 4. *Thornburg v. Gingles,*[148] the first substantive interpretation by the Supreme Court of the 1982 amendment in the context of an at-large election system, is important for several reasons. First, it recognized, through the language and legislative history of the 1982 amendment to § 2, that the intent of Congress in amending § 2 was to eliminate the requirement of showing discriminatory intent in a challenge to a contested electoral mechanism which had been imposed by the plurality decision in *City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980),[149] and replaced it with the "results test" formulated by the Supreme Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).[150] By doing so, Congress sought to focus the inquiry on the effect a contested electoral mechanism has on a minority group's ability to participate equally in the political process and away from the legislature's intent.[151]

■ 5. Section § 2 now utilizes the results test of *White v. Regester.* The *White* test provides that

[t]he plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political process and to elect legislators of their choice.

*White,* 412 U.S. at 766, 93 S.Ct. at 2339, citing *Whitcomb v. Chavis,* 403 U.S. 124, 149–150, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971).

■ 6. This test requires the Court to engage in a searching and practical inquiry into the "past and present reality" of the circumstances existent in the challenged jurisdiction. *White,* 412 U.S. at 769–770, 93 S.Ct. at 2341. It is a flexible test and turns on the facts of each particular case.

■ 7. Although it did not intend them to be either comprehensive or exclusive, Congress, in an effort to give guidance to the courts in applying the results test, enumerated a number of typical factors plaintiffs could show to establish a § 2 claim, to-wit:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

---

**148.** 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

**149.** In *Bolden,* the Supreme Court held that a minority group could prove a § 2 violation only by showing that state officials intentionally maintained or adopted a contested electoral mechanism with a discriminatory purpose. 446 U.S. at 66–67, 100 S.Ct. at 1499–1500.

**150.** Footnote 4 in *Gingles,* 478 U.S. at 36, 106 S.Ct. at 2759 states:

These factors were derived from the analytical framework of *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), as refined and developed by the lower courts, in particular by the Fifth Circuit in *Zimmer v. McKeithen,* 485 F.2d 1297 (1973), *aff'd sub nom. East Carroll Parish School Board v. Mar-*

*shall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam), S.Rep. at 28, n. 113. *See also* footnotes 7, 8, and 9, 478 U.S. at 43–44, 106 S.Ct. at 2763.

**151.** *See* S.Rep. at 27, 1982 U.S.Code Cong. & Admin.News at 205, which states:

The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system or practice in order to establish a violation. Plaintiffs must prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process. *Id.*

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

8. Other factors that sometimes have had probative value as part of plaintiffs' evidence to establish a § 2 violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417 at 28–29, reprinted in 1982 U.S.Code Cong. & Admin.News at 206–207 (footnotes omitted).

■ 9. However, plaintiffs are not required to prove any particular number of factors or that a majority of factors point a particular way to establish a violation. *Id.* at 29, 1982 U.S.Code Cong. & Admin.News at 207.

■ 10. Finally, despite the enumerated Senate Report factors, three necessary preconditions must exist for a contested electoral mechanism to dilute minority voting power. That three-part test, as formulated by the *Gingles* Court, is as follows:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.

... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed,—usually to defeat the minority's preferred candidate.

478 U.S. at 48–51, 106 S.Ct. at 2766–2767.

■ 11. Although § 2 is designed to provide equal access to the political process, neither it or the case law construing it gives members of a protected class an unqualified right to elect a number of representatives equal to its proportion of the population. Both *Whitcomb* and *White* held that proof of a § 2 violation requires more than showing that the minority group has failed to elect representatives equal to its proportion of the population. S.Rep. at 23, 1982 U.S.Code Cong. & Admin.News at 200.

12. The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives.[152]

■ 13. The Supreme Court has long recognized that multi-member districts and at-large voting schemes may " 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.' "[153]

See also *Rogers v. Lodge*, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982); *White v. Regester*, 412 U.S. 755, 765, 93 S.Ct. 2332, 2339; *Whitcomb v. Chavis*, 403 U.S. 124, 143, 91 S.Ct. 1858, 1869, 29 L.Ed.2d 363 (1971).

152. *Gingles*, 478 U.S. at 47, 106 S.Ct. at 2764.

153. *Id.* (quoting *Burns v. Richardson*, 384 U.S. 73, 88, 86 S.Ct. 1286, 1294, 16 L.Ed.2d 376 (1966) (quoting *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965)).

14. The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters.[154]

15. However, multi-member districts and at-large election schemes are not per se violative of minority voters' rights.[155]

16. Minority voters who contend that the multi-member form of districting violates § 2, must prove that the use of a multi-member electoral structure operates to minimize or cancel out their ability to elect their preferred candidates.[156]

17. Although § 2 is designed to provide equal access to the political process, neither it or the case law construing it gives members of a protected class an unqualified right to elect a number of representatives equal to its proportion of the population.

18. With regard to the first prong of *Gingles*, the Court finds, contrary to the defendants' contention otherwise, that the plaintiffs need not show that they constitute a majority of the voting age *citizens* in a proposed single-member district. The Fifth Circuit has consistently held that plaintiffs in a § 2 case need only show that they can draw a proposed district in which they comprise a majority of the voting age *population* in order to satisfy the first prong of *Gingles*.

19. The Court concludes that the plaintiffs have demonstrated that they are sufficiently large and geographically compact to constitute a majority of the voting age population in Plaintiffs' Proposed District 3.

20. There is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics.[157] However, to prove the fact of their electoral dilution, plaintiffs must prove that Blacks and Hispanics actually vote together and are impeded in their ability to elect their own candidates by all of the circumstances, including especially the bloc voting of a white majority that usually defeats the candidate of the minority. This does not mean that plaintiffs must show that Blacks are cohesive, that Hispanics are cohesive, and that Blacks and Hispanics are together cohesive. Instead, the proper standard is the same as *Gingles*; whether the minority group together votes in a cohesive manner for the minority candidate.[158]

21. Political cohesiveness can be demonstrated by showing that "a significant number of minority group members usually vote for the same candidate." [159]

22. The Court concludes that plaintiffs have shown that there is political cohesion among Black and Hispanic voters in NEISD and have, therefore, satisfied the second prong of *Gingles*.

23. With regard to the defendants' attempt to include Anglo–Anglo races in its analysis, this ignores Fifth Circuit case law which has consistently viewed elections between white candidates as "generally less probative in examining the success of minority-preferred candidates," generally on the ground that such elections fail to provide minority voters with the choice of a minority candidate.[160]

**154.** 478 U.S. at 30, 106 S.Ct. at 2765.

**155.** *Id.* (citing *Rogers v. Lodge, supra,* 458 U.S. at 617, 102 S.Ct. at 3275; *Regester, supra,* 412 U.S. at 765, 93 S.Ct. at 2339; *Whitcomb, supra,* 403 U.S. at 142, 91 S.Ct. at 1868).

**156.** 478 U.S. at 48, 106 S.Ct. at 2765.

**157.** *Campos v. City of Baytown, Texas,* 840 F.2d 1240, 1244 (5th Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). As noted by the Fifth Circuit, "[s]ection 1973(a) protects the right to vote of both racial and language minorities." *Id.*

**158.** *Campos v. City of Baytown, Texas,* 840 F.2d at 1245.

**159.** *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769.

**160.** *LULAC v. Clements,* 999 F.2d at 864. See also *Campos v. City of Baytown,* 840 F.2d at 1245; *Citizens for a Better Gretna v. City of Gretna,* 834 F.2d at 503. See also *Williams v. City of Dallas,* 734 F.Supp. 1317, 1318 (N.D.Tex.1990) (basis for the "political cohesiveness" inquiry should first—*and primarily*—be those elections in which a *serious* black candidate was opposed by a white candidate) (emphasis in original). As explained by the district court in *Williams v. City of Dallas, supra,* there are several reasons for focusing on white versus minority races when conducting an inquiry into the political cohesiveness of the minority plaintiff:

■ 24. The Court also concludes that plaintiffs have demonstrated that the white majority in NEISD votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the preferred candidate of Black and Hispanic voters in NEISD.[161] Thus, plaintiffs have satisfied the third prong of *Gingles.*

25. Based upon the totality of the circumstances, the Court finds that the current at-large electoral system in the North East Independent School Districts dilutes the ability of Hispanics and Blacks to participate equally in the political process and elect candidates of their choice in school board elections and therefore violates § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. Accordingly, the Court finds that the at-large electoral system used by the North East Independent School District is null and void.

■ 26. It is unclear whether the Fifteenth Amendment applies to vote dilution claims, and, if so, to what extent.[162] Insofar as the present action is concerned, the Court finds that the Fifteenth Amendment's prohibition against "purposeful discriminatory denial or abridgement by government of the freedom to vote 'on account of race, color, or previous condition of servitude'" is subsumed in the analysis required under the Fourteenth Amendment's equal protection clause.[163]

■ 27. To prevail on their claim under the Fourteenth Amendment, plaintiffs must show: (1) intentional discrimination; and (2) a resultant discriminatory effect.[164] The discriminatory purpose need only be a motivating factor in the school district's decision to conduct at-large elections; it need not be the sole or even primary factor in that decision in order to find a violation of the Fourteenth Amendment.[165] A discriminatory purpose, as a motivating factor, "implies more than intent as volition or intent as awareness of consequences."[166] Instead, it implies that the decision-maker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[167]

First, these races provide the most direct test of the hypothesis that race is a factor in the election system under scrutiny. Second, although the results in white versus white races should be considered, *to emphasize them without careful and practical scrutiny* ignores the discriminatory effect of an at-large system which discourages potential, viable [minority] candidates from running for election, given a long history of elections lost because of a white bloc vote. *LULAC v. Midland ISD,* 648 F.Supp. 596, 607 (W.D.Tex.1986).... Finally, "when there are only white candidates to choose from," it is "virtually unavoidable that certain white candidates would be supported by a large percentage of ... [minority] voters"; however, "evidence of [minority] support for white candidates in an all-white field" would tell us nothing about the political cohesiveness of [a minority group] or about the "the tendency of white bloc voting to defeat [minority] candidates." (Citations omitted) 734 F.Supp. at 1388 (emphasis in original).

**161.** As noted by the Supreme Court in *Gingles,* "the language of Section 2 and its legislative history plainly demonstrate that proof that some minority candidates have been elected does not foreclose a Section 2 claim." 478 U.S. at 75, 106 S.Ct. at 2779.

**162.** *See Shaw v. Reno,* — U.S. —, —–—, 113 S.Ct. 2816, 2822–2824, 125 L.Ed.2d 511 (1993) (discussing Fifteenth Amendment at length with respect to racial gerrymandering, but ultimately deciding case on Fourteenth Amendment grounds); *Voinovich v. Quilter,* 507 U.S. 146, —, 113 S.Ct. 1149, 1158, 122 L.Ed.2d 500 (1993) ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we never have held any legislative apportionment inconsistent with the Fifteenth Amendment.") (citation omitted).

**163.** *Mobile v. Bolden,* 446 U.S. 55, 65, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980) (quoting the Fifteenth Amendment.) *See also Turner v. Arkansas,* 784 F.Supp. 553, 578–79 (E.D.Ark.1991) (three-judge court) (proof of conscious racial discrimination required in both Fourteenth and Fifteenth Amendment cases), *aff'd mem.,* 504 U.S. 952, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992).

**164.** *Davis v. Bandemer,* 478 U.S. 109, 127, 106 S.Ct. 2797, 2807–08, 92 L.Ed.2d 85 (1986).

**165.** *Nevett v. Sides,* 571 F.2d 209, 217–218 (5th Cir.1978), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980).

**166.** *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

**167.** *Id.*

28. The plaintiffs have failed to adduce any credible evidence that North East Independent School District installed the at-large system with the intent to discriminate against Hispanic and/or Black voters of NEISD.

28. The Court finds that the plaintiffs have not proven their claim of intentional discrimination under the Fourteenth Amendment.

29. Plaintiffs are the prevailing party and are therefore entitled to an award of attorney's fees under 42 U.S.C. §§ 1973*l* and 1988.

### *REMEDY*

The parties shall have thirty (30) days from the date of the entry of this order to meet and to negotiate on a proposed remedy. If they are able to reach an agreement, the parties shall submit a proposed order to the Court disposing of the merits of this case on or before Tuesday, October 31, 1995. If the parties cannot reach an agreement, each party shall file its proposed remedy with supporting briefs and exhibits on or before Friday, November 10, 1995.

With regard to the plaintiff's attorney's fees, the parties shall meet on or before Tuesday, October 31, 1995 to negotiate an appropriate award. If the parties are unable to come to an agreement on the amount of attorney's fees, plaintiffs shall file its motion for attorney's fees in the form and manner prescribed by Local Court Rule CV–7(j)(1) not later than Monday, November 6, 1995. The defendants shall file their objections thereto on or before Friday, November 17, 1995. The parties are strongly encouraged to stipulate to as many facts as possible so as to eliminate the need for a hearing on this matter.